May it please the Court, my name is Stephen Klenda, I represent Sandy, Tanya and Jennifer Hutchens. This is an appeal of a civil RICO judgment. That judgment was based on a claim the plaintiffs don't have, an unclean hands offense that defendants were not allowed to assert, and no evidence of jurisdiction over wire fraud by or actionable conspiracy by Tanya Hutchens. I'll address those three points and rely on my briefs for the remainder of my arguments. First, plaintiffs failed to state a valid RICO claim against the Hutchens, and the reason is simple. Their complaint alleged that the enterprise under RICO was the alter ego of the people that operated the enterprise. RICO requires that a person operate an enterprise, and those two things must be distinct. If you make an alter ego allegation, you're saying they're the same, so you can't have it both ways. Now, what plaintiffs say to that is it's pretty important to address that argument in the case of Cedric Kushner, but it didn't. Cedric Kushner did not involve a case with any alter ego allegations whatsoever. What Cedric Kushner said resolves just a very narrow question of whether a single individual could be associated with an enterprise that's composed of a single entity, and all Cedric Kushner did was say, apply the basic principle of formal separateness and said, look, a corporation and its employees or its sole shareholders are legally distinct. In that case, the corporation had one shareholder and one executive, essentially, right? Exactly, Your Honor. Would that not always be an alter ego? No. It's not always an alter ego for exactly the reasons that Cedric Kushner said, because we normally treat a sole shareholder as distinct from the corporation, but when you're alleging they're the same, you can't rely on that presumption, and that's the principle that's applied here, and that's the principle that the Roberts case in the District of Utah used to eliminate the civil reco claim in that case, the claim was dismissed because it wasn't valid. Pretty simple, straightforward. And here, the court doesn't even have to recognize that as a general principle, because the plaintiffs received extensive benefits throughout the course of the litigation from treating the property management companies and the lenders as altered egos of the operators of the enterprise. They relied on that question for class certification to obtain jurisdiction over the property management companies and to obtain a Mareeva injunction in Canada. So they treated them the same throughout, and now suddenly at the end of the case, they're trying to claim that they're different. I don't believe they should be able to do that. Second point, the unclean hands defense that defendants weren't allowed to assert. Here what plaintiffs have done is taken the principle that unclean hands must in some sense have some majored effect on the balance of equities between the parties and turned that into a principle in which a district court can somehow balance equities between the parties to eliminate an unclean hands defense. Let me ask you a question about this. So say in this case, on the applications, the false statements were someone misstating their age and their address and not items that would indicate that they weren't financially able to qualify for a loan. Would you still continue to have an unclean hands defense? I would not, Your Honor, because those aren't material allegations. Those aren't the types of misrepresentations that would induce the lender to issue a loan commitment on the basis that the loan is feasible. Okay, so if there was an evidentiary determination in this case that your client didn't have the capability of making the loans in the first place and had no intention of making the loans, whether someone qualified or not, what would the difference be? The difference would be that in the case we're dealing with here, the wrongdoing by the borrowers is defined as a federal criminal act, making a material misrepresentation on a mortgage application as a federal crime. That doesn't mean misspelling your name. What if someone had checked a box saying they were Hispanic and they weren't? Again, that wouldn't be an allegation that is material. Well, it would be a federal crime. Try 18 U.S.C. 1014. It's a federal crime. You can make a false statement on a loan application that's a federal crime. It doesn't have to have materiality associated with it. And here, so as a relation, I didn't mean to interrupt. It just seems to me that in this situation, the fact that they, if as alleged, there was never any intention to pay or to fund these loans, they could have said they were a man on the moon. You wouldn't have funded it anyway. So what difference does it make? There's a disjunction between the alleged unclean hands and the fraud that's alleged in the repo allocation. So how do those things come together? Precisely in this way, Your Honor. The only reason borrowers were issued a loan commitment and therefore had to pay an upfront fee is based upon the representations that they made in their application. Had they not made those misrepresentations, they never would have received a loan commitment in the first place. And the testimony on that is undisputed. The testimony even plaintiffs have admitted that that's the way it operated. That's the way the lenders operated. That is the way that the one loan they funded operated because there were no misrepresentations when they did the due diligence on that particular application. They issued the loan commitment based upon a survey of what they perceived to be the financial stability of the borrower. As represented by the borrower on a loan application. And if the whole allegation of the scheme is that you were never going to fund the loans irrespective of what they said, then how does it follow that one would be carefully scrutinizing the accuracy of their financial stability in whether to fund a loan? No, whether to fund the loan, which implies that you would ever consider funding a loan to begin with. I understand, Your Honor. We submitted as evidence in the, at trial, the sample loan applications, and we had in fact in the courtroom 50 or 60 boxes of those loan applications. And in each of those applications, there were due diligence activities that were conducted that indicated that Hutchins was going to carefully scrutinize the conditions that were represented in the loan applications. Let's not forget that there were initially allegations against an appraiser in this case. Somehow he was involved in this scheme. Those allegations were dismissed because there was no evidence. But the evidence shows that the appraiser went out, he's an experienced real estate guy in Canada, knows real estate like the back of his hand, more than probably I know about Civil Reco at this moment, and inspected the properties to do hands on the ground due diligence. Okay. That is an indication that there was due diligence done and there was in fact an ability to verify the, or an intent to verify what was going on on the ground and if the properties would support the repayment of the loan. Regardless. Let me ask, there may have been evidence to that effect, but did not the jury have to determine that there was no intent to actually get these people loans, which would make this due diligence nothing more than a charade? I don't believe so, Your Honor, because if in fact the applicants were seeking a loan based upon material misrepresentations about that omitted, that omitted judgments, that omitted bankruptcies, that grossly overvalued the property, that even made misrepresentations about the ownership of the property, then those borrowers shouldn't be allowed to recover under Civil Reco because they have essentially committed the same offense, wire fraud, transmitting a false, intentionally false loan application over the wires. And that shouldn't be allowed. What you're saying, what the court seems to be saying, is that the defense of unclean hands shouldn't apply in this case because we think Hutchins was dirtier than the borrowers and that's exactly the type of kind of balancing approach to unclean hands that the precision case of the U.S. Supreme Court in the 40s rejected. What did the evidence show about who paid the appraiser? The appraiser was paid through a specific wire transfer to the lender, in most cases, that was then transferred to the appraiser. Was the wire transfer from the alleged fraud victims? I mean, were the people who were wanting to borrow the money paying the appraiser?  See, and so that's, I mean, it all comes back to this. You're wanting to preclude them from asserting a claim based on an unclean hands theory, but it doesn't have any, and you say, well look, we were doing this due diligence, we were getting an appraisal. Well, you charged them for it. They were getting an appraisal. They had to pay for it. And so you were getting all of their money and you have a finding that we're never going to fund the loans, that you couldn't have funded the loans. So there's no connection between their false statements and your conduct. So I just don't, I'm having a hard time making the unclean hands defense flow toward these plaintiffs. All that's required, your honor, is that the alleged improper conduct have some measure of effect on the balance of equities between the parties. And I think here there is at least some measure of effect on the balance of the equities between the parties and the defense shouldn't be foreclosed. And remind me, proof standard, we're talking about preponderance, right? For what in particular, your honor? To get qualified for the defense. We would have to prove that if we were allowed to assert it by the preponderance of the evidence. Yes, yes. Yes, your honor. Finally, one final point here, and before I reserve some time for rebuttal, there is no evidence in the record that Tanya Hutch had had any minimal contact with the United States. And so the court shouldn't even exercise jurisdiction over her. Isn't there an argument here that she had possibly continuous and systematic contacts with the United States through her prior activity? The way I read it, you're saying, look, the accountant's testimony related to things she was doing before this alleged scheme occurred. So there's no, uh, there's no contact, but she, it's not that she didn't have contacts with the United States. And you're just saying in specific with this scheme, she didn't. No, I think you can look at plaintiff's own words, point blank, the court asked them, why is Tanya Hutchins in this case? Their answer was she received some proceeds from the alleged scheme. District courts have unanimously held that the receipt of proceeds from some, you know, some bad actions isn't sufficient minimum contact with the United States to establish jurisdiction. Okay. But that's, that would be the sole evidence. And I think my question is, is couldn't she, couldn't there be jurisdiction over her based on other activities she was conducting in the United States, whether it related to this scheme or not? No, but there's no evidence of that in the record. What about the accountant's testimony saying she was part of, you know, she'd worked with their husband, they'd schemed against other people in the past, reached into Colorado, sent confirming emails. What we have here, your honor, is she has to have some contact. No, you can't because that activity occurred all in Canada. You can't say that because that activity occurred years beforehand and it was all specific to the United States based on some prior activity that occurred solely in Canada, especially when you have an enterprise that is specifically defined as class members in the United States who received or who submitted loan applications. I'd like to reserve the right to ask questions. I've got a question for you first. What if she were the mastermind? She organized it, she told people what to do, but she never did one thing in the United States. Would she be free of liability because of lack of jurisdiction in that circumstance? Yes. But that's not what the evidence shows. I just wanted to see where your argument takes us because that's hard to stomach. Usually if you're intending to do something that hurts people in the United States, you're subject to the U.S. jurisdiction. We certainly have that in tort law in general. But here you don't have any particular acts that show that she was directing any activity toward the United States whatsoever. What you're trying to assert here is some sort of conspiracy liability, which Colorado has not adopted. Which Colorado has not adopted? That's right. It hasn't recognized that. I thought this was a RICO case. Why are we looking to Colorado law? It is, Your Honor. But plaintiffs asserted jurisdiction under the Colorado Long-Rime Statute. That's the basis of the jurisdiction over Tonya Hutchins. But if she is, I think, consistent with Judge Hart's hypothetical, though, even if you ratchet it down from being a mastermind, if she is a participant in a scheme that touches citizens in Colorado, that's intended to touch citizens of Colorado, then why isn't that sufficient to give Colorado, using the Colorado Long-Rime Statute, to provide for jurisdiction as it relates to her? Because you're inferring to her actions of other parties, actions of co-conspirators that might touch the United States, and that's specifically what Colorado has rejected. Thank you. Good morning, Your Honors, and may it please the Court. I am Kevin Roddy. My colleague at table is Scott Shepard. We are co-lead counsel for plaintiffs in the class. We tried the case in the district court. Why don't you pick up with the last point about jurisdiction? and talk about how her participation or lack thereof in the scheme would impact the ability to have jurisdiction. Absolutely. This issue originally arose on motion to dismiss. Judge, the plaintiffs alleged that Tonya was a primary participant in the scheme, and at the motion to dismiss stage, Judge Jackson and the district court found that those allegations were sufficient. The issue was raised again at summary judgment, and plaintiffs came forward with affidavits from Randy Gazar, who Your Honor, Judge Carson was referring to. He was their ex-business partner, and Martin Lapidus, who was their former accountant. They put sworn declarations in the record. Judge Jackson found that at summary judgment, sufficient evidence to show that Tonya Hutchins was an active participant in the scheme. Now, was that when the scheme was restricted to Canadian victims? No. Was there any activity by this scheme in the United States at the time of the evidence showing her participation? Yes, Your Honor. Let's remember, the class period in this case as certified by Judge Jackson and as affirmed by this court in 2014 stretched from, I'm sorry, let me get the date. It includes the Gazar period, right? Yeah. The class period here runs from January 2005 to April 2013. The Gazar involvement with Sandy and Tonya runs from late 2004 to early 2007, and what let's call it that, when Sandy was forming Canadian funding, 308 Elgin, and First Central Mortgage, which are three-fifths of the RICO enterprise. Embedded in my question, there was a legal point. I mean, yes, Tonya was a participant, but I heard your adversary counsel say, okay, fine. Even if she were a participant, as a matter of law, that would not provide a basis for jurisdiction over her. That's my understanding of what I heard, and what I want from you is an answer as to, and that was predicated on some notion I think that if she was a conspirator, that would not be enough to link her to activities of the scheme in Colorado. As a matter of law, is that right? As a matter of law, if, as the district court found and the jury implicitly found that she was an active participant in the scheme, then yes, absolutely, that's enough to hold her in. And Judge Jackson analyzed this issue repeatedly. Well, let me, before we get to his analysis, if the scheme that there's evidence she was part of was an intra-Canadian scheme. Yes. Involving the same enterprise. Okay. And then the scheme expanded to the United States, but there's no evidence of her involvement once the expansion took place. Don't you have a jurisdictional problem? I don't care about the, how we define the class, we've still got to show jurisdiction. You've got to show jurisdiction. The U.S. wing of the scheme, the first loan was made in March of 2008. Tanya always took the position in the district court that she never received a penny, that her children never received a penny, her properties never received a penny. She swore that under oath to the district court in an affidavit. We called her to the stand on day six of the trial. She was cross-examined about the financial statements for Canadian funding, 308 Elgin, and first central mortgage, and she admitted receiving vast sums of money in 2008, 2009, and 2010, which takes us well into the class period in the United States. And what are you inferring from the fact that she received it? Receipt of funds wouldn't be enough. It shows that, you know, there's a parallel question in this case. We have to show active participation for jurisdiction under the test posited by Judge Jackson. We also have to show some degree of participation on her part under the operation or management test for Section 1962C liability. She has to play some part in managing the enterprise. We had sufficient proof as to both wings, and that's why the case went to the jury. You know, the jury was out for about two hours. They had no trouble figuring out what happened. So what was your proof of her management and active participation? Our proof was the gazar testimony at the front end of the enterprise, the 2004, 2005, 2006, 2007 time period, her continuous receipt of vast sums of money. And the district court held that based upon that evidence and his having watched her performance on the witness stand, he said there's enough here that a jury has to decide this, given the absence of credibility. Okay, so it would be pre-U.S. activity coupled with receipt of money during the U.S. activity period. All related to the same enterprise. All related to the same enterprise, okay. Well, that last statement, all related to the same enterprise, if the gazar testimony related to the Canadian wing of that enterprise, and that's all you have, and she receives money under the allegation of receiving dirty money is not enough, I'm getting a little concerned here. What else do you have? I mean because receipt of the money is not enough. The gazar testimony provides an inference. I know, you know, we can rely on inferences, but there still needs to be some evidence of her participation when it went into the United States. And are you relying in part on this letter from Sandy to the attorney? I mean what do you have during that period where the enterprise was in the United States? First of all, respectfully, Your Honor, the gazar testimony from the 2004 to early 2007 time period is more than an inference. Gazar gave very specific testimony of his eyeball witnessing of Tanya's business activities in conjunction with gazar and her husband, 92 separate loan transactions. Tanya's business activities in connection with the enterprise as it related to Canada or related to the United States? As it related to Canada. Well, all right then, that's my point. As it relates to Canada, you can get an inference that she continued on with the activity, but that inference is not that strong unless you have something else to show that she did something in the United States. And that's what I'm asking you. Well, we have the letter, which was admitted into evidence in the court, as Judge Jackson said is another inference, that she was involved in setting up the website for First Central Mortgage, the letter from the ex-lawyer, Meisels. We have, as I mentioned, her uncontradicted receipt of money in 2008, 2009. For every financial statement that they produced to us, we showed that money was flowing out the back door of the lenders to the Hutchins family, to Tanya, to her mother, and into these properties. Real quick, from U.S. victims? Yes, absolutely. So is it your argument that the receipt of the money in the later periods is evidence that the enterprise continued from Canadian activity into the U.S. activity and that she was actively participating in the U.S. activity? Yes, and the only difference is he adds two more wheels to the enterprise when he starts using it. He builds the first three, he forms the first three corporate entities, and then he forms Northern Capital. And then incredibly, while this case is going on, in 2011, in the district court, he forms GEIF, Great Eastern, and he continues to carry out the scheme. And at trial, I asked him on cross-examination, isn't it true that you're now doing business as Ed Ryan and you're running a lending operation called Westmoreland Equity? And he said yes. Even during trial, he hadn't stopped. I want to make sure I cover these points. This is a, look, the person enterprise point. What is the enterprise alleged and proved at the trial? The enterprise alleged and proved are the five so-called Hutchins entities, or we call them euphemistically lenders because none of them ever made a loan. There's five of them that were owned by Sandy, incorporated by Sandy. We put into evidence the Ontario corporate profile receipts. We put into evidence their financial statements. They are clearly. And you also alleged, presumably proved, that these five entities were all alter egos of the same individual. That was alleged in the complaint. It was not, we did not proceed on that theory at trial as Judge Jackson found. And Judge Jackson said it still wouldn't make a difference. Judge Jackson has addressed this issue at least five times. So you alleged alter ego. You abandoned that allegation for purposes of trial. We didn't need it because we had proven that they were real corporations and that he was the sole shareholder. It's the Cedric Kushner versus Don King paradigm. So just so we're clear, you did abandon that theory at trial? Yes. We offered no proof that they were alter egos at trial. We didn't have to. And please remember this. First of all, under this court's decision in Safe Streets Alliance versus Hickenlooper, which is the recent marijuana case from 2017, and under the George versus Urban Settlement case from this court in 2016, which we rely upon and which they don't even cite, this is a textbook RICO case. Judge Jackson hit every ball right down the middle, and he has more than a dozen rulings. That's what we're here to determine, right, whether Judge Jackson's right? Yes. But I think you'll see that every issue that he ruled on, he made a very careful record involving citation of authority. It is with regard to unclean hands, he didn't present them. He didn't prevent them from offering proof of the fact that a borrower might have made a misrepresentation. There are 125 borrowers in this class. If you look at our trial exhibit 64, which is the chart prepared by our expert CPA, financial fraud guy, you can see every borrower. I'm sorry. If any of those, we put five borrowers on the witness stand at trial. The three plaintiffs testified live. We brought in another borrower named Mike May from Utah and another borrower by the name of Arthur Pye, who we deposed on videotape. If there was anything untoward about any of these borrowers, opposing counsel had every opportunity to cross-examine them at trial and to try and prove that any of them had unclean hands. And in some cases, the cross-examination of the borrowers lasted five minutes. Did they ask any of them if they had lied on their application? Absolutely. Absolutely. James Medic, who's a distinguished businessman from Las Vegas, Nevada, was cross-examined about whether or not he had allegedly made material misrepresentations on his mortgage form. The jury heard all of this, okay? And he denied any misrepresentations or not? Of course he did. Of course he did. I want to leave this out. I'm not sure. So you're saying that regardless of the legal validity of such an unclean hands argument, there's no evidence to support it? Correct. I don't think, as we said in our brief, we don't think it is a defense under the RICO statute based on antitrust laws. But you're also saying there's no evidence to support it? Right. And there was no effort by the court, no order by the court, preventing them from putting it on? No. But was that the court's rationale for rejecting that defense? No. What Judge Jackson did was he surveyed the case law and he found that the case law as to RICO unclean hands went both ways and there was no controlling decision from this court. So then he stepped back and he looked at the equities of unclean hands and he said he didn't say I'm not precluding you from presenting the evidence. Go ahead and present the evidence if you've got evidence of material misrepresentations presented. And they tried to, to the extent they had it. And our class representatives fought back and said, no, I didn't make this misrepresentation. I just want to be clear. I mean there could be a few ways to view this. One, unclean hands is not a defense in a RICO claim. Two, there was not evidence of unclean hands or it just was not evidence of it. Three is what I understood Judge Jackson do, which is to say that even if there were statements in this case, those statements really, misrepresentations, those statements really wouldn't matter because the nature of the scheme was as such that nobody cared whether they were true or not and therefore there was not a connection between any misconduct and the scheme. Did he not use that rationale? He did. He used that rationale as to unclean hands and as to causation. But you're saying that we wouldn't even have to accept that rationale. The fact of the matter is there was no evidence of unclean hands. Correct. I want to finish with this thought as to the balance of the equities. There's a related appeal pending before this court, which is number 18-1444. The Hutchins defendants are in contempt of the district court. They failed. They were assessed $62,000. Is this part of the record on this appeal? Pardon me? Is this part of the record on this appeal? It is in our brief, yes. The district court assessed discovery sanctions of $62,000, which they refused to pay. We went to Judge Jackson and asked him to hold them in contempt, which he did in October, docket number 935. He assessed a $500 per diem penalty as long as those sanctions remain unpaid. As of today, they owe in excess of $130,000 in discovery sanctions. Let me ask a couple questions. Why was the class period, why did it begin several years before any of the victims in the class had invested, had paid any money? What's the purpose of that? Based upon the allegation that the scheme began at an earlier date. Why would that relate to the class period? Why would that be a reason to move back the class period? Because when you're on the plaintiff's side, it's very customary for courts to define a class beginning at an earlier date because you don't know which victims you're going to find when you start looking for victims. And in fact, in this case, after we became involved, we found a victim who fell after the class period. We asked Judge Jackson to expand the class period, and he did not. The other question I have is, does the RICO statute allow for constructive trust as a remedy? Absolutely. Judge Jackson analyzed it. Tell us, the statute looks like it's talking about prospective relief. It says you can grant injunctive relief, prospective relief to restrain or prevent, some language like that, violations. That's looking forward. The constructive trust remedy looks backward. What's your authority, then, to interpret the RICO statute as allowing the constructive trust as a remedy here? My authority is the Second Circuit's decision in the Chevron v. Donziger case. That's cited in our brief where the Second Circuit found that section 1964A of RICO is broad enough when you couple that with the district court. It reminds us that it's broad enough, and it's forward-looking. It sure doesn't. We don't have to agree with the Second Circuit, I don't think. I understand that. So try to. . . I'm familiar with Chevron. Yes. But that doesn't mean that it's convincing. Well, I. . . So try. . . Explain to me how you get that forward-looking authority in RICO to allow remedies. Well, a constructive trust can be backward-looking. It can also be forward-looking. Well, in this case, isn't it backward-looking? What about it is forward-looking? Because the Hutchins defendants continue to operate the Hutchins properties. They're mostly apartment houses in Ontario, multifamily dwellings. They generate monthly income, which could and should be used to satisfy the judgment which they owe. And how does this constructive trust affect their ability to prevent or restrain them from doing that? From doing RICO violations in particular. Correct. Yes. I understand. I believe that Section 1964A empowers the district court to award sufficient relief going forward and looking backward where necessary to enforce a judgment. Well, if the statute doesn't say that as it relates to this particular form of relief, prevent or restrain is forward-looking language. Yes. And as I've said, these properties continue to generate money that could, should be used to satisfy our client's judgment. I mean, isn't that just an ordinary collection problem, though? You have a judgment, they've got income, and now you can go get the money? None of these problems are ordinary because the property and the assets are located in Ontario. As indicated in our brief, we have a judgment enforcement action pending in Ontario Superior Court. That court has now empowered what's called a receiver-manager to take hold of the properties, to liquidate them if necessary, to seize the income as it comes in on a monthly basis. Yes, we are pursuing not only post-judgment discovery in the district court, we're seeking to enforce our judgment in the Superior Court of Ontario. Okay. So through that action, I mean, you're going to, you're presumably able to get the relief that you would get through your constructive trust anyway. We hope so. We hope so. I just want to finish by mentioning that next month... No, your time is up. Your time is up. Thank you, Your Honors. Your time expired, but I'm going to give you two and a half minutes because we went five minutes over. Thank you, Your Honor. I'd just like to make one final point. The reason there's no evidence at trial with respect to unclean hands is that Judge Jackson precluded us from asserting that defense at trial. At a pretrial hearing, I couldn't put my hands on it right there, but there's a footnote in our reply brief in which Jackson says specifically, look, okay, there's some question. Before, I said, you know, unclean hands might apply here, but I haven't seen anything that convinces me it applies in this case yet, even though plaintiffs' own witnesses turned out to testify, including their FBI expert and one of the loan brokers, that those types of misrepresentations on the loan applications that we had evidence of were fraud. What Jackson said at the pretrial conference was, okay, there may have been some question before. I'm going to settle it now. You can't assert the defense. Did you ask him the questions, though? Did the evidence come in? I don't. I'm not recalling it at the moment. Did you try to impeach the class representatives with testimony about lying on their applications? I'm not recalling specifically, Your Honor. I do apologize. I should be able to recall that, but I don't want to make a misstatement. It certainly wasn't a focus because we didn't think the unclean hands was at issue. What was at issue at trial, according to the class certification opinion of the Tenth Circuit, was whether the lender was legitimate. That was the fundamental issue at trial, and that's what the Tenth Circuit previously said could be decided in one fell swoop. Okay, so the bottom line on the evidentiary point is because you had a ruling from the court saying you couldn't have the defense, therefore you couldn't inform the jury as a matter of law regarding the defense. That just did not become the focus of your approach at trial. That's correct, Your Honor. Okay. That's absolutely correct. I wanted to be clear about that. It wasn't just a case where Judge Jackson said, Well, you can go ahead right over here and you can introduce a little bit of evidence on that over here. Absolutely not. The hammer came down. You can't have that defense at trial. But he didn't stop you from using the same evidence as impeachment. That would be correct. Okay. That would be correct. All right. So your opposing counsel says that you did cross-examine them with that evidence, whether it's of any moment or not. I mean, the evidence was in the record. Well, if I would have, you can't just assume that I would have done the same cross-examination as I would have done being precluded from preserving the defense. And you wouldn't get a legal instruction to the jury either. That's right. I couldn't do that at all. Thank you, Your Honor. Thank you, Counsel. Case submitted. Counselor excused.